

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

AL:DCP/LKG/JMS
F. #2017R01308

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 26, 2017

By Hand and ECF

The Honorable Steven L. Tiscione
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Victor Agosto, et al.
                 Docket No. 17-CR-390 (RJD)_____

Dear Judge Tiscione:

      The government respectfully submits this letter in support of its motion for permanent orders of detention as to the six defendants charged in the above-captioned indictment: Victor Agosto, also known as "Bebo," Perfecto Deleon, also known as "Fec," Luis Lopez, also known as "Lou," Andres Reyes, also known as "Dre," Nestor Rivera, also known as "Tito" and "Tito Bird," and Peter Vasquez.

      All of the defendants have been indicted for a narcotics offense that carries a mandatory minimum sentence of ten years; three of them face an additional consecutive five-year minimum for their use of firearms in furtherance of narcotics trafficking, exposing those defendants to a 15-year mandatory minimum sentence.  The strong incentive to flee alone means that the defendants cannot rebut the statutory presumption that they pose risks of flight.  Nor can the defendants—many of whom have lengthy criminal histories, and some of whom committed horrific violent crimes—rebut the presumption that they pose dangers to the community.

BACKGROUND

On July 26, 2017, the defendants were arrested pursuant to a two-count indictment returned by a Grand Jury in the Eastern District of New York charging all of them with conspiracy to distribute and possess with intent to distribute narcotics, in violation of 18 U.S.C. §§ 841 and 846, and charging Agosto, Lopez and Vasquez with use of firearms in connection with a drug trafficking crime, in violation of 18 U.S.C. §924(c).

The charges stem from an investigation conducted by the New York Metropolitan Safe Streets Task Force, which is comprised of agents from the Federal Bureau of Investigation ("FBI") and detectives from the New York City Police Department ("NYPD"), that began in March 2015. The investigation revealed that the defendants, led by Agosto, Lopez and Vasquez, were members of a large-scale heroin trafficking organization with Mexican cartel connections. The members of the charged conspiracy operate in Brooklyn and Queens, among other locations, and distribute hundreds of kilograms of heroin on an annual basis.

DISCUSSION

I. Legal Standard

A. The Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Similarly, a defendant should be detained if the court finds that release on bail would pose a danger, 18 U.S.C. § 3142(e), though detention based on dangerousness must "be supported by clear and convincing evidence," 18 U.S.C. § 3142(f).

The Bail Reform Act lists four factors to be considered in the detention analysis, whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g).

Under the Bail Reform Act, when detention is at issue, the government may proceed by proffer, United States v. Ferranti, 66 F.3d 540, 541 (2d Cir. 1995); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (explaining that the government is entitled to proceed by proffer in a detention hearing); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same), and so may the defendant, Martir, 782 F.2d at 1145.

B.     Presumption Cases

Under the Bail Reform Act, a presumption both of flight and dangerousness arises when there is probable cause to believe the defendant committed a drug offense carrying a maximum sentence of ten years or more, or a firearms offense under 18 U.S.C. § 924(c).  18 U.S.C. § 3142(e)(3)(A), (B).  In cases where a defendant is charged with "an offense under section the Controlled Substances Act," a rebuttable presumption arises "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(A).  The same presumption against bail arises in cases where a defendant is charged with an offense under 18 U.S.C. § 924(c).  18 U.S.C. § 3142(e)(3)(B).

Probable cause may be established by an indictment, such that there is no need for an independent judicial probable cause determination.  United States v. Contreras, 776 F.2d 51, 55 (2d Cir. 1985).  If a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that contradicts notions of flight risk or dangerousness."  United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).  A bail package sufficient to overcome a presumption of flight may not be enough to overcome a presumption of dangerousness.  United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991).  Regardless of whether the presumption applies, the government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community.  Mercedes, 254 F.3d at 436.

C.     Danger to the Community

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).  Significantly, dangerousness includes "the harm to society caused by [the likelihood of continued] narcotics trafficking."  United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).  Under the Bail Reform Act, the Second Circuit views home detention and electronic monitoring as insufficient to protect the community against dangerous individuals:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills.  If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

Millan, 4 F.3d at 1049 (internal citations and quotation marks omitted); see also United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) (noting that "electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology"; rejecting

3

$3 million bail package secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring) (internal citations and quotation marks omitted).

II. Application

    A. A Presumption of Detention Applies

In this case, a presumption of detention arises under 18 U.S.C. § 3142(e)(3) for each of the defendants. As noted above, Section 3142(e)(3)(A) provides for such a presumption when there is probable cause to believe the defendants committed a narcotics trafficking offense such as the one charged in the indictment. Defendants Agosto, Lopez and Vasquez are additionally subject to a presumption under 18 U.S.C. § 3142 (e)(3)(B) because they are charged with committing a firearms offense under 924(c). Because the defendants were variously indicted for these offenses, probable cause arises and the presumptions apply. Contreras, 776 F.2d at 55.

    B. The Defendants Are Each a Danger to the Community and Risk of Flight

All four factors set forth in Section 3142(g) compel the conclusion that the defendants pose a danger to the community.

        1. The Nature and Circumstances of the Offenses Charged

First, "the nature and circumstances of the offense[s] charged" are extremely serious. The defendants are charged for their respective roles in a large-scale, long-term heroin distribution conspiracy with international Mexican cartel connections that trafficked hundreds of kilograms of heroin into New York City. As part of that conspiracy, the defendants transported kilogram quantities of heroin from Los Angeles, Chicago and elsewhere to New York on numerous occasions and conducted meetings with their source of supply in Mexico. Their narcotics distribution generated millions of dollars of proceeds for the defendants.

Moreover, members of the conspiracy regularly possessed and used firearms in connection with their narcotics trafficking. The scope and scale of the defendants' conduct, combined with the constant presence of firearms demonstrates the seriousness of the defendants' criminal conduct.

        2. The Weight of the Evidence

Second, "the weight of the evidence against the [defendants]" is strong. The charges will be proven by, inter alia, a Title III wiretap on a co-conspirator's phone, among others, electronic surveillance, telephone records, money seizures, narcotics purchases, physical evidence and witness testimony.[1] In particular, law enforcement has seized hundreds of

---

[1] The government hereby provides notice to the defendants pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap interceptions at the detention hearing in this case. In order to

thousands of dollars in proceeds and heroin from the organization. Additionally, law enforcement has purchased heroin directly from members of the charged conspiracy. Video surveillance, telephone records, social media and travel records further corroborate the interworking of the charged conspiracy and the relationships of its members.

During the arrest of the defendants earlier this morning, law enforcement recovered approximately twelve kilograms of heroin worth approximately $900,000, along with other materials used in the processing and distribution of heroin, from a stash house maintained by Victor Agosto and used by other members of the conspiracy.

a. Witness Testimony

At trial, the government will present multiple witnesses who will detail the scope of the narcotics conspiracy, the roles of each of the defendants in the conspiracy and the use of firearms and violence to advance and sustain the narcotics distribution efforts. In particular, the witnesses will discuss the relationships among the defendants and the witnesses' experience dealing narcotics with the defendants. The witness testimony will be corroborated by testimony from law enforcement agents and other evidence, some of which is set forth below.

b. Money Seizures

Law enforcement has seized over $800,000 of Lopez's and Vasquez's drug proceeds during the period of the charged conspiracy. For instance, in December 2011, Ohio State troopers stopped a vehicle driven by a relative of Vasquez's and recovered $311,000 within the stow compartment. The vehicle was rented by Vasquez from LaGuardia Airport two days before the seizure.

In April 2012, law enforcement made an additional seizure from Vasquez. Vasquez and an associate were separately intercepted over a wiretap in Chicago speaking to an individual who was later arrested for heroin trafficking. On April 16, 2012, law enforcement stopped a BMW Vasquez was travelling in and recovered another $100,000 from a Cheerios box hidden inside the vehicle. Vasquez confirmed that the money was his and claimed that he was taking it a friend, but did not know the friend's name. Vasquez and the person he was with consented to a search of Vasquez's residence in Yonkers, which, they left prior to the car stop. Law enforcement recovered a firearm bag, magazine and ammunition from the location.

In May 2013, New Jersey law enforcement officers executed a search warrant on a stash house maintained by Lopez and Vasquez and recovered nearly $20,000, a press used to process kilos of heroin and other materials used in the distribution of heroin. Law enforcement observed Vasquez at the location on the same day of the search warrant execution.

---

preserve the integrity and confidentiality of the government's investigation, notice to the defendant of the wiretap interceptions prior to his arrest was not feasible. This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

In June 2014, Pennsylvania State troopers stopped a 2011 Lexus (registered to Lopez's wife) driven by Lopez's sister and her husband. During a consensual search of the vehicle, troopers uncovered a sophisticated trap behind the second row of seats and recovered thirteen duct-taped packages containing just over $300,000. Latent fingerprint examination revealed Lopez's fingerprints on each of the bundles of cash.

In February 2015, law enforcement officers in Indiana recovered $48,000 from a hidden compartment in a Chevrolet suburban driven by Lopez's relative and his wife. Simultaneous to that stop, another set of troopers stopped a vehicle driving in tandem with the Suburban that was carrying Lopez and Rivera.

      c.      Narcotics Purchases

Between December 2015 and May 2017, law enforcement has made eight street-level heroin purchases from Andres Reyes and his workers. Reyes himself arranged the purchases made from his workers. In some of those purchases, Reyes used vehicles belonging to Nestor Rivera to drop off the heroin.

      d.      Other Corroborative Evidence

Video surveillance, telephone records and social media postings demonstrate the interconnectedness of the charged narcotics conspiracy. Lopez, Vasquez, Rivera, DeLeon and Reyes regularly meet at a garage owed by Lopez, as evidenced by video camera footage at that location. Video outside of a car wash owned by Lopez similarly shows members of the charged conspiracy meeting during the charged conspiracy.

Law enforcement has identified dozens of cellular telephone numbers belonging to members of the conspiracy. Telephone records show hundreds of contacts between the defendants during the charged timeframe of the conspiracy, particularly as the defendants regularly switched phones to evade detection. Social media postings further corroborate the connections between the defendants as evidenced by their trips to Miami and Las Vegas together. See Gov. Exs. A and B.

International travel records reveal that Lopez and Vasquez, neither of whom are of Mexican descent, made multiple trips to Mexico City during the charged conspiracy, corroborating their Mexican cartel connections and the meetings they attended in Mexico in furtherance of their narcotics operation. The records indicate that Vasquez and Lopez travelled to Mexico City together in 2013 and 2016, and each took an additional trip—Lopez in 2015 and Vasquez in 2017.

3. The History and Characteristics of the Defendants

   a. Louis Lopez and Peter Vasquez

      i. Unexplained Wealth

Louis Lopez is the brother-in-law of Peter Vasquez, after marrying Vasquez's sister, and their connection dates back even further to their teenage years. Lopez and Vasquez are business partners and the leaders of the charged heroin conspiracy. The proceeds of their narcotics operation have funded lavish lifestyles, including luxury cars, expensive jewelry, designer clothes and expensive vacations. Such unexplained wealth demonstrates that Lopez and Vasquez have the power and ability to flee and commit acts of violence without detection. See United States v. Torres, 435 F. Supp. 2d 179, 182-83 (W.D.N.Y. 2006) (noting that magistrate judge relied on the defendant's "unexplained wealth" in denying the defendant's bail application).

The fleet of cars that Lopez and Vasquez have compiled is exceptional, including a Lamborghini Hurácan, Rolls Royce Ghost, Bentley, Audi R8 Spyder, Mercedes CLS63, Mercedes S550, Porsche Cayenne, Maserati, Range Rover Sport and BMW M4, worth over a million dollars. Vasquez purchased the Rolls Royce Ghost for himself around his 29th birthday (and painted it cherry red and registered it under Lopez's name), and the Porsche Cayenne as a gift for his mother. See Gov. Exs. C and D. Vasquez's car collection also includes the Audi R8 Spyder, a Mercedes S63 and a Range Rover Sport each registered under his sisters' names. See Gov. Ex. E. Lopez drives the Lamborghini Hurácan, which he also had painted cherry red. See Gov. Ex. F.

Pursuant to a seizure warrant, law enforcement seized the Rolls Royce Ghost, Lamborghini Hurácan, Audi R8 Spyder, Mercedes CLS63 AMG and Range Rover Sport earlier this morning. See Gov. Exs. G, H and I.

Lopez and Vasquez also own hundreds of thousands of dollars in jewelry. Lopez's wife publicly displays the couple's expensive jewelry and designer merchandise, all proceeds of the charged narcotics trafficking operation. They chauffeured their youngest child in a Versace stroller that retails for over $3,000, and dressed their eight-year-old in Gucci sneakers worth hundreds of dollars. See Gov. Ex. J. For Christmas in 2015, Lopez received an Audemars Piguet watch worth approximately $20,000, Vasquez received a Cuban-link gold bracelet, and Vasquez's mother received gold and diamond earrings. See Gov. Ex. K. For his birthday in 2015, Lopez received a 256-gram piece of gold jewelry and a diamond-encrusted ring. See Gov. Ex. L. More recently, in November 2016, a photograph of Lopez and his wife boasts "#VersaceDown #Chanel #Rolex" (referring to her dress, handbag and watch) standing next to Lopez who is wearing his five kilogram solid gold chain with a Jesus medallion. See Gov. Exs. M and N. In another photograph, Lopez proudly displays his gold bracelets. See Gov. Ex. O. In sum, the drug money Lopez has is significant.

In addition to the expensive cars and high-end goods, Lopez and Vasquez are regulars in Miami, where they rent luxury homes and yachts. See Gov. Exs. P and A. And their travel records evidence their exotic vacations. Vasquez's international travel records show trips to Cancun, Montego Bay, Punta Cana, Costa Rica and Dominican Republic in the last few years. Lopez visited all of the same destinations with the exception of Costa Rica.

### ii. Additional Violence

Vasquez and Lopez regularly possess firearms in connection with their narcotics distribution activities. They possessed firearms in "stash houses" where they stored and processed heroin for sale and in hidden compartments that were installed in their vehicles.

Moreover, Vasquez is responsible for the shooting of a young boy in April 2012 with a gun supplied by Lopez. A cooperating witness ("CW-1")[2] has advised that CW-1 sought the assistance of Lopez and Vasquez on April 2, 2012, in confronting some Trinitario gang members in South Williamsburg in response to the gang members confronting CW-1 with a knife. CW-1 went to Lopez's residence and found Lopez and Vasquez. Vasquez put one of Lopez's firearms in a hidden "trap" compartment of CW-1's car, and the group, including Lopez and Vasquez, returned to the vicinity of the dispute. After they arrived, the group encountered a large number of Trinitarios, at which point Vasquez removed the firearm from the trap and shot into the crowd. A 10-year-old child, who was not Vasquez's target, sustained a gunshot wound to his side and was treated at Bellevue Hospital.

### b. Victor Agosto

### i. Unexplained Wealth

Agosto's success in the narcotics business is evidenced by the Mercedes S550 he drives. Like Lopez and Vasquez, Agosto also wears designer clothing and expensive jewelry. See Gov. Ex. Q. In another photograph, Agosto poses inside of one of his narcotics stash houses wearing a heavy gold chain. See Gov. Ex. R.

### ii. Additional Violence

Agosto possesses and uses firearms in furtherance of his narcotics distribution activity and relied on a crew of the violent street gang the Yung Gunnerz, also known as the YGs, based in the Bushwick neighborhood of Brooklyn, to provide protection for his illicit business. Agosto also regularly keeps firearms in his "stash houses" and vehicles. On November 14, 2015, Agosto was arrested by the NYPD in possession of a .357 Magnum Ruger

---

[2] CW-1 was arrested by the FBI in 2015, and pled guilty to narcotics distribution charges in the Eastern District of New York in 2016. CW-1 is cooperating with the hope of receiving a reduced sentence. Information previously provided by CW-1 has been corroborated in significant part by information provided by confidential sources, audio recordings and physical evidence.

8

firearm in front of a nightclub in Manhattan. In telephone calls obtained pursuant to a Title III wiretap, Agosto confirmed that he was carrying a firearm to the nightclub on the evening of his arrest and multiple government witnesses will confirm that Agosto admitted carrying a firearm that evening.[3]

In addition, in March 2013, according to CW-1 and others, Agosto was involved in the murder of two individuals in a residence he maintained as a "stash" house in Bushwick, Brooklyn. During that shooting, the two victims attempted to rob Agosto of narcotics and narcotics proceeds. During the course of the robbery, Agosto used a firearm he kept in his residence to shoot both victims. Both victims eventually died in Agosto's residence. Following the deaths, Agosto and others (including Lopez and Vasquez) removed the bodies to a field in Queens, New York and lit them on fire in an attempt to destroy evidence of the murder.

### iii. Criminal History

In addition to the above-referenced arrest for gun possession, in March 2011, Agosto was arrested in Queens for felony possession of narcotics with the intent to sell. Although Agosto ultimately pled guilty to a lesser-included charge of driving while impaired, the evidence of his arrest with narcotics during the charged conspiracy is probative of the charges in the instant offense.

Agosto also has a documented history of deceptive conduct toward law enforcement. Following his 2015 gun possession arrest, Agosto gave arresting officers identification documents belonging to his brother as part of an attempt to use his brother's identity as part of the arrest. This bears on his willingness and ability to flee.

### c.  Perfecto Deleon

Perfecto Deleon has three prior felony convictions and may qualify as a career offender, which would expose him to a sentence of 360 months' to life imprisonment. In 1993, Deleon was convicted of Attempted Robbery in the First Degree and sentenced to two-and-a-half to seven-and-a-half years' imprisonment for his participation in a gunpoint robbery. In 1997, Deleon was convicted of Criminal Possession of Stolen Property in the Third Degree and sentenced to three-and-a-half to seven years' imprisonment. In 2004, he was convicted of felony Criminal Possession of a Controlled Substance in the Fifth Degree (possession with intent to sell) and sentenced to two to four years' imprisonment. Deleon served terms of supervised released after each of his three felony convictions, and he violated parole each time, which bears on both dangerousness and risk of flight.

---

[3] Agosto was acquitted after a jury trial in Manhattan Supreme Court on firearms possession charges. Nonetheless, there is ample evidence in the form of physical evidence, witness testimony and recorded phone calls that Agosto possessed a firearm that day.

      d.      <u>Andres Reyes</u>

Andres Reyes has been dealing narcotics for close to 20 years and for his numerous prior controlled substance offenses qualifies as a career offender, which subjects him to a sentence of 360 months' to life imprisonment.

In 1999, when he was 16 years old, he was adjudicated a juvenile delinquent for felony Criminal Possession of a Controlled Substance in the Fifth Degree (intent to sell). Five months later, Reyes was rearrested for selling narcotics. In January 2000, Reyes was convicted of Attempted Criminal Sale of a Controlled Substance in the Third Degree, a felony. Instead of returning for sentencing, Reyes absconded. Reyes' returned to court in May 2000, but only because he was arrested on a new charge for selling narcotics on school grounds. Reyes plea-bargained that arrest down to Attempted Criminal Sale of a Controlled Substance in the Third Degree. With prison sentences pending on two separate felony cases, Reyes absconded yet again—this time for over seven months. Reyes was ultimately sentenced to two-and-a-third to seven years' imprisonment and two-and-a-half to seven years' on the respective cases. In February 2009, Reyes was released from prison and began his term of court-ordered supervision.

Only nine months into his term of supervision, in November 2009, Reyes was rearrested for possessing felony weight cocaine (over 500 milligrams of cocaine). Reyes's history of failing to appear for court continued on that case until he pled guilty, in 2011, to his fifth felony narcotics offense for which he received a two and a half year term of imprisonment. After his release from prison in 2013, and while under another term of court-ordered supervision, Reyes was twice rearrested for narcotics offenses (November 2014 and February 2015) for which he pled guilty to misdemeanor possession crimes. Reyes' parole was subsequently revoked in May 2015, and he was sentenced to thirty months' imprisonment.

Reyes's utter disregard for the criminal justice system as evidenced by his numerous bench warrants, parole revocations and continued sale of narcotics while under court supervision coupled with his exposure on the instant case highlights the risk he poses—both of reoffending and flight—if released.

      e.      <u>Nestor Rivera</u>

Nestor Rivera has an extensive criminal history demonstrating his persistent involvement in narcotics trafficking and a total disregard for judicial, post-conviction and pre-trial supervision. Rivera's documented history dealing narcotics dates back to 1995 when he was approximately 17 years old, and he has four prior narcotics-related felony convictions. Because of his record of serious narcotics offenses, Rivera qualifies as a career offender and faces 360 months' to life imprisonment.

In 1995, Rivera was convicted of felony Attempted Criminal Sale of a Controlled Substance in the Third Degree and sentenced to probation. Rivera violated the terms of his probation and was resentenced to nine months' jail in 2000. In March 2002, Rivera was

10

convicted of misdemeanor Criminal Possession of a Controlled Substance in the Seven Degree. In August 2002, approximately two years after his discharge from probation, Rivera was rearrested for selling narcotics on school grounds. While that felony case was pending, Rivera was arrested two months later, in October 2002, for yet again selling narcotics on school grounds. Rivera resolved both of the cases in April 2003 with felony pleas to Criminal Possession of a Controlled Substance in the Fifth Degree (over 500 milligrams of cocaine) and Criminal Sale of a Controlled Substance in the Fourth Degree, respectively. With jail sentences looming after the two guilty pleas, Rivera spent over a year as a fugitive, and a bench warrant was issued. Rivera ultimately completed his respective sentences (three-and-a-half to seven years' and three to six years' imprisonment) and was released to parole in November 2006. Rivera was rearrested at least twice while on parole for possession of controlled substances for which he received misdemeanor convictions in 2008 and 2011, respectively. Rivera's parole was also revoked as a result of those arrests. Rivera's most recent felony conviction, in 2011, was for Attempting to Knowingly Make/Possess Dangerous Contraband in Prison in the First Degree, for which he was sentenced to one-and-a-half to three years' imprisonment.

Rivera has already shown a propensity to miss court appearances as he has had multiple bench warrants entered against him in state court. Furthermore, he has a documented history of deceptive conduct toward law enforcement. Records indicate that Rivera has provided aliases to law enforcement (Joel Gonzalez, Tito Santiago and David Santiago) on at least three separate occasions and given at least three different dates of birth during prior arrests. Given the evidence against him, the sentence he faces, and his prior history of failing to appear in court, Rivera presents an unacceptable risk of flight and danger to the community. Releasing the defendant would only guarantee one outcome: continuation of his dangerous criminal conduct. See Leon, 766 F.2d at 81 (dangerousness includes "the harm to society caused by [the likelihood of continued] narcotics trafficking").

### 4. The Nature and Seriousness of the Danger Posed by Release

Fourth and finally, "the nature and seriousness of the danger to any person or the community that would be posed by the person's release" strongly supports a finding of dangerousness. The extent and nature of the defendants' drug trafficking activities are serious in themselves, and the defendants' access to firearms demonstrates the heightened level of dangerousness presented by them.

\* \* \*

For the foregoing reasons, the government respectfully submits that the defendants cannot meet their burden of defeating the presumption that "that no condition or

11

combination of conditions will reasonably assure [their] appearance . . . as required and the safety of the community" and therefore should be detained pending trial.  18 U.S.C. § 3142(e)(3)(B).

                    Respectfully submitted,

                    BRIDGET M. ROHDE
                    Acting United States Attorney

By:      /s/
                    David C. Pitluck
                    Lindsay K. Gerdes
                    Jennifer M. Sasso
                    Assistant U.S. Attorneys
                    (718) 254-6108/6155/6402

cc:    Defense Attorneys (by ECF)
        Clerk of Court (SLT) (by ECF)